ALBERT NELSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 6768.  Promulgated April 18, 1946.

*Raymond A. Fox, Esq.*, and *Harvey H. Berger, C. P. A.*, for the petitioner.

*Clarence E. Price, Esq.*, and *Walter W. Kerr, Esq.*, for the respondent.

## OPINION.

HILL, *Judge*: The Commissioner determined that the entire 1941 net income of $9,403.91 from the operation of the Aberdeen Hotel was taxable to petitioner under the provisions of section 22 (a) of the

Internal Revenue Code. He contends that petitioner, for tax purposes, was the owner of the property, that the operation of the hotel in 1941 was the business of petitioner and hence any income derived therefrom was taxable to him.

The petitioner states that the pertinent question to be determined is "Who is the *owner* of the property, Albert Nelson or his wife, Goldye Jean Nelson?" and he contends that, since the wife was the owner of the property in 1941, the income was taxable to her as income from "dealings in property, whether real or personal, growing out of the *ownership*" of such property. Sec. 22 (a).

The petitioner at all times from 1934 through 1941 had control over all moneys received in the linen business, the hotel business, and his other business activities. All such funds were commingled in one bank account in the name of A. Nelson Co. and petitioner alone had authority to withdraw such funds. The petitioner became the licensed operator of the Aberdeen Hotel in 1936 under lease, which lease is not in evidence. He continued to operate the hotel as licensed operator and manager of the hotel after the purchase of the property on land contract in 1939 through 1941. The payment of $8,200 on the land contract was made from petitioner's bank account and all subsequent monthly payments up to and including the last one on December 3, 1942, were also from such bank account.

It is true the wife testified categorically that the hotel business and income therefrom was hers, but there is no clear and convincing evidence to sustain her statements. The petitioner did not definitely so testify. Although petitioner's wife was quite positive in claiming the hotel property as her own and as paid for with her own money, she was unable to recall whether or not she signed the application for the mortgage, the note of $20,000, or the mortgage, none of which are in evidence. Petitioner testified that his wife worked in the linen business until the early part of 1938, when the first baby came and she had to stop work, that thereafter she did not work every day, but just occasionally, and that this was true in both the hotel business and the linen business. The wife admitted that her husband was operator and manager of the hotel and that she did not alone manage it, that there were three clerks there most of the time and also maids who did the work. The testimony of both petitioner and his wife was rather indefinite and vague as to the nature of the services rendered by her during 1941, but both testified that she would come to the hotel to look at or check on the accounts. However, the accounts or records were not kept by her, but by the bookkeeper employed by petitioner.

At no time did petitioner's wife have control of the hotel receipts or disbursements. As heretofore stated, all such receipts were de-

posited in the A. Nelson Co. bank account and all withdrawals were made by checks signed by petitioner. During 1941 no check was issued to the wife. All she received was an allowance for household expenses, and this allowance was given to her by petitioner. Five checks were presented in evidence which petitioner testified were checks made out to his wife to "settle off some of the account of the Aberdeen Hotel." All the checks were checks of A. Nelson Co. signed by petitioner and drawn on the National Bank of Detroit. The first check, dated September 18, 1939, for the sum of $500 payable to B. C. Schram, Receiver, First National Bank of Detroit, was the first down payment made to the receiver by Phil Taubman on the purchase of the hotel property. It was a part of the initial payment of $8,200 on the land contract. The second check for $5,000, dated November 8, 1941, was payable to "Cash." It was endorsed by both petitioner and his wife and bears the stamp of the National Bank of Detroit dated December 10, 1941. This check was entered in the record of disbursements as paid to cash in the personal column in which the personal expenditures of petitioner were entered. There is nothing in such record to indicate that the check represented a distribution of profits of the hotel business to petitioner's wife. The remaining checks, one dated November 9, 1942, and the other two dated December 31, 1942, for the amounts of $4,000, $3,000, and $406.29, respectively, were made payable to G. J. Nelson, petitioner's wife, and are endorsed by her. The $3,000 check bears a stamp reading "Mortgage Teller, Dec. 31, 1942, National Bank of Detroit." The check for $4,000 and the check for $406.29 bear a stamp of Manufacturers National Bank of Detroit, one dated October 9, 1942, and the other January 6, 1943. It is rather significant that these three checks were issued at or about the time the land contract, on which there was a balance due of $26,159.52, plus 6 percent interest from November 30, 1942, was paid up. The evidence shows that $20,000 was obtained for such purpose on a mortgage note from the National Bank of Detroit, but the source of the remainder of the balance due of $6,159.52 and interest, plus any expense of refinancing, is not disclosed by the evidence. The checks, and the vague and indefinite evidence concerning them, do not, in our opinion, establish, as claimed by petitioner, that the checks represented balances due the wife from the Aberdeen Hotel operations. Section 22 (a), in so far as pertinent, is as follows:

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from * * * businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the *ownership* or *use of* or interest in such property; * * * [Emphasis supplied.]

Income may be derived from dealings in property growing out of the "ownership" or the "use" of such property. Ownership may be

in one person and the right to the use of the same property may be in another, with income flowing to each. To one it would be income growing out of the ownership of such property and to the other income growing out of the use of such property. Although legal title to the hotel property was in petitioner's wife, it does not follow that she was entitled in 1941 to the income growing out of the use thereof. The petitioner acquired the right to the use of the property in 1936 for the purpose of operating a hotel and he continued such use after the execution of the land contract. There is no evidence that petitioner intended to or did turn over to his wife the hotel business itself, or that he acted as her agent in the management thereof. There is no evidence that petitioner agreed to or did pay his wife any sum whatever as rental for the use of the property in his business.

Even if it be conceded that petitioner's wife had an equitable interest in A. Nelson Co. which she withdrew by payment by petitioner of the $8,200 on the land contract, as suggested by counsel of petitioner, it would not of itself prove that the hotel business and the income derived from such business belonged to her. If the hotel business had been run by a stranger instead of by petitioner, his wife, by reason of the purchase of the realty, could not legally lay claim to the hotel business operated by the stranger on the property and the entire income therefrom as well, but would be entitled only to the rental theretofore paid by the stranger as required by his lease.

The case of *Herman Gessner*, 32 B. T. A. 1258, cited by the petitioner in support of his contention that the income was taxable to his wife as owner of the property, is distinguishable on the facts. In that case the husband and wife owned as tenants by the entireties certain real estate in Michigan from which they received a gross rental in 1931 of $21,600. The husband and wife filed separate returns in which each reported one-half of the income. The Commissioner contended that the entire income from the realty was taxable to the husband. It was held that under the laws of Michigan the income from property held as tenants by the entireties was taxable equally to the husband and wife. The income in that case was clearly income growing out of the ownership of property and not out of the use thereof. The case of *H. D. Webster*, 4 T. C. 1169, cited by petitioner, is also distinguishable on the facts.

We do not believe that the Michigan courts have held that the owner of realty is entitled, by reason of his ownership thereof, to the entire income growing out of the use of such property, where the right to such use is held by one other than the owner and the other's use thereof produced the income. What the Supreme Court stated in *Commissioner* v. *Tower*, 327 U. S. 280, although it has reference

to a husband and wife partnership, is equally applicable here, as follows:

> * * * Thus, Michigan could and might decide that the stock-transfer here was sufficient under state law to pass title to the wife, so that in the event of her death it would pass to whatever members of her family would be entitled to receive it under Michigan's law of descent and distribution. But Michigan cannot by its decisions and laws governing questions over which it has final say, also decide issues of federal tax law and thus hamper the effective enforcement of a valid federal tax levied against earned income. * * *

It is our conclusion that the income in question was earned by petitioner in the operation of his own business and hence it is taxable to him.

(2) The evidence shows that the reduction of 1941 sales by $160.31 was the result of an accounting adjustment made by petitioner's accountant on his work sheets to adjust accounts receivable control as set up by him to conform to the detailed list of accounts receivable as of December 31, 1941. Neither the accountant nor the petitioner was able to state when the discrepancy arose and to what error of commission or omission it might be attributable. Net income must be computed upon the basis of an annual accounting period. Net income in one year may not be reduced to correct errors or discrepancies which arose in a prior year. Since the petitioner has failed to show that 1941 sales were properly reduced by reason of some error in sales or the omission of some item of expense in connection therewith, the determination of the Commissioner in increasing 1941 net income by $160.31 must be approved.

(3) The claimed deduction of automobile expense and depreciation and entertainment expense totaling $1,070 was based upon a mere estimate of petitioner. The evidence shows that he did use the automobile in his business and that he did entertain some of his customers for business reasons. After a careful consideration of the indefinite and unsatisfactory testimony of petitioner and bearing heavily upon him "whose inexactitude is of his own making," we have concluded and have so found that he is entitled to an allowance for depreciation on the automobile of $162.50 and to a deduction of $155.96 for gasoline, $42.22 for automobile insurance, and $150 for entertainment, as ordinary and necessary business expenses. *Cohan* v. *Commissioner*, 39 Fed. (2d) 540.

*Decision will be entered under Rule 50.*